Good morning, Your Honors. May it please the Court, my name is Christopher Rudd, and I represent the plaintiff and the appellant in this action, Dr. Tim LaHaye. It is my intention to reserve five minutes of rebuttal time. I'll try and watch the clock. Dr. LaHaye has raised four issues on his appeal to the District Court's summary judgment on his claims for breach of contract, breach of the implied covenant, and declaratory relief. The first two deal with his contract claims, the second with his debt relief claims. With respect to the contract-based claims, Dr. LaHaye is entitled to a trial on his claim that by releasing the movie at issue first on video and only afterwards theatrically, defendants breached the covenant of good faith and fair dealing in an April 1997 memorandum. What is the link of inferences that gets you there? Because the contract itself conveys almost all distribution rights to namesake, including theatrical release and including videocassette release. So how do you imply a covenant to do one rather than the other? We don't imply a covenant to do one rather than the other. We imply a covenant as to timing. Your Honor, as this Court recognized in the Marsu case recently, even when one party to a rights agreement is granted very broad discretion as to exploitation of those may be the subject of an implied covenant claim. In California, the implied covenant is used in precisely these circumstances, where you have arguably a very broad branch of rights, which is silenced on details, as it is here. The contract at issue has no distribution terms, but it does have a very broad branch of rights contained in, I believe, paragraph 5. Once you have that, that broad discretion and no details. But if it confers discretion, if it confers discretion, then isn't the review for objective unreasonableness or, you know, bad faith? Certainly. The review in this case would be whether, on objective terms, the parties or the defendant in this case acted in bad faith. We introduced evidence at the trial court level that such a decision was in bad faith because it severely curtailed the revenue potential of the firm and undercut the benefit my client had bargained for in entering into the April 1997 agreement. You have an agreement that is completely silent with respect to distribution terms. You have a situation just as in Marsu or Locke. It could have produced some money at the time that a theatrical release would have bombed out. I mean, that's possible, too. It absolutely is, and that's what trials are for, Your Honor. If we had a trial on this, the defendants could very well prevail. And they could say, we have introduced evidence, we did this for the following reasons, we didn't do it to undercut your benefits, they've introduced evidence, that is for a trier of fact to decide. Once we introduced evidence at the trial court stage, including the declaration of Richard Rosenberg, our expert, which called into question this distribution strategy and explained how it undercut the revenue potential of the firm, we had done enough to raise a triable issue of material fact to get to trial on this claim. Following up on that, are you saying that, like, paragraph 5 is, I don't quite understand the logic. You're saying that it's ambiguous or somehow incomplete, so we have to turn to the parties understanding that the theatrical motion picture would be produced before, produced and distributed before a video? No, Your Honor. I'm not suggesting there's ambiguity in the contract. I'm suggesting incompleteness in the contract. If one looks at the contract itself, by its terms and title, it's a memorandum short-form agreement, which was intended to be followed up with a long-form, which would have had distribution terms. That is the question I have. This does look to me like a short-form memorandum that was to be later turned into an actual long-form contract with standard industry terms and maybe filling out some more terms. Do you have any evidence in the record that that was the case, or are you simply relying on the if-needed sentence in paragraph 18? The evidence in the record includes the declaration of Richard Rosenberg, the plaintiff's expert, who described in great detail in his declaration in connection with the summary judgments below the silence on, in this contract, on details that would be necessary in order to not just produce but to exploit a motion picture. The contract itself, as you've mentioned, has an express term, I'll get to later, that talks about if needed, the parties will negotiate a long-form agreement. But the plaintiff's own expert indicated the agreement is silent with respect to things like budget, with respect to things like accounting, now the subject of another action below, with respect to things like distribution and the order of distribution. The memorandum itself talks about them paying for a theatrical motion picture. Dr. LeHay didn't get one. He got a video-first release, which was subsequently released in theaters. Whether or not that release strategy was bad faith is an issue that should have been resolved by trial court, and it's an issue that falls under the covenant law in California under Marsau and Disney. And in fact, the defendants, the defenses to this claim largely consist of their claim that it was never raised before. That is not true. It was in the record, and we've cited evidence below where it appeared. It was raised in the record. It was argued by your opponents in response to your summary judgment motion, I think. But where is this timing issue raised? Is it somehow a tribal issue of fact? Well, I believe the last page of the declaration of Richard Rosenberg, plaintiff's expert, says that it's well known in the entertainment industry. I'm sure, but a district judge, you know, can't go hunting truffles. I believe so. So where was the issue actually presented in the district court, an opposition to summary judgment, that the timing was a breach of the good faith covenant? I believe, Your Honor, that the timing was raised in the context of not just the Risenberg, the declaration of Tim LaHaye, the plaintiff. It was raised in excerpt of record 121 and 122. It was raised... I'm still talking truffles here. You know, it may well be lurking in the record. No doubt there are lots of things lurking in the record if we went plowing around and found them. But the question is, where was it, front and center, argued to the district judge, that timing is one of the respects in which the covenant of good faith and fair dealing was breached? Your Honor, I'm not going to say that that was front and center in the motions for summary judgment, but it was raised. In fact, it was raised in, excuse me, the opposition... I know. I know that. At 14 and 15? That's the opposition. And at 22? I'm sorry. Was it raised on our motion for summary judgment? I don't believe we're appealing our motion for summary judgment. No, but I mean, was it raised in your opposition to their cross-motion? Yes, it was, Your Honor. It was? Okay. At pages 14, 15, 22 through 23. Now, conceivably, it wasn't front and center. This Court has recognized on a number of occasions that frequently issues on appeal are more carefully explicated and more fully described. In fact, in this Court's Cope Mountain case, issues like this come up. Well, yes. Sometimes refined legal issues are. But this is, you know, sort of the heart of your present bad faith claim. Respectfully, Your Honor, it was raised again and again below. It was raised in 21 and 31 of the First Amendment complaint. That's fine. I'll add. With respect to the implied claim, of course, the defendants have argued that it wasn't raised below, and the record is replete with references to it. I've mentioned some of them. It was in Plaintiff's declaration. It was in the declaration of his or the testimony of his co-author. It was in deposition test at Excerpt of Record 2, Tab 13. It was in discovery responses at Excerpt of Record 3, Tab 13. And in fact, the defendants argued before the district court that there below, we were raising this argument for the very first time there. This is not a new argument. Perhaps it's more carefully focused and more centered here, but it was raised below. Defendants also argue that the district court's findings on this issue preclude sending it back for trial, and that's simply wrong. If the court actually looks at the findings by the district court, they don't deal with this issue. After a bench trial on the issue of promissory fraud, the Court made findings with respect to fraud in the inducement and reliance, not with respect to disputes over the contract terms at issue here. Well, the district court made some findings about what was and wasn't promised. Yes. And aren't those findings? No, Your Honor. If you look at the district court's findings, particularly there in, I believe, 22 and 23 of the district court findings, you'll find what they talked about. They talked about how the authors met the producers in January of 1997 at the National Religious Broadcast Convention. And they talked about the discussions back and forth. And they didn't talk about what ended up in the contract because they couldn't. They were talking about formation issues. They talked about things like, the district court said, The authors ultimately granted the rights to Left Behind and Tribulation Force to Namesake rather than to NORAN due to authors and Namesake's shared theology, as well as to Goodman's expressed enthusiasm for the project during the meeting with the authors at the NRB, and that in deciding to grant the authors, I'm still The authors did not rely upon any discussions of budgetary figures. The authors continued participation in the movie production, nor upon discussions of style, scope, or medium of the contemplated Left Behind. The Court found what they relied upon. They weren't concrete and didn't result in promises. They weren't concrete and didn't result in promises that induced the defendants to choose Namesake in January of 1997 rather than their rival. This contract was entered into in April of 1997. The Court's findings are limited to decisions that the authors made at the convention, which said, We'll go with Motion Picture Production Company A, not Motion Picture Production Company B. The Court never made any findings with respect to the contractual provisions concerning distribution strategy. It couldn't. The evidence wasn't before it. It didn't make any findings with respect to contractual provisions regarding budget. If I go to a Ford dealer and buy a car because I like the way it looks or the way it handles and I don't rely upon the warranty or an obligation by the dealer to fix the paint if it chips, if it chips, I can still sue them for breach of contract even if I didn't rely upon that as a promise in entering into the contract. Much the same is true here. What the Court is talking about is what did the plaintiffs in this case listen to and believe in choosing Namesake over Noran, not what did the contract end up in and what terms did the contract end up with. They couldn't because those issues simply weren't before it. They'd been disposed of six months earlier. I guess the third issue besides the Court's findings is the defendants' reliance upon authority. The authority they rely upon in the implied covenant context is, it's misplaced and in one case it's misquoted. In their brief, they rely upon the Racine case for a number of different issues and they flatly misquote it. At page 36 of their brief, defendants purport to quote the Racine court as saying, and I'm quoting, the implied covenant, quote, cannot be extended to create obligations not created in the contract. Well, I went back and looked. That's not what the case says. What it actually says is the implied covenant cannot be extended to create obligations not contemplated by the contract. Defendants narrow a construction of Racine, helps them, and hurts us, and it's wrong. The contract obviously contemplated distribution terms. We've talked about it earlier. There was a grant of rights that said the film would be distributed. It didn't talk about where it would be distributed, when, and in what order, but clearly it was contemplated. The silence was managed. So what are we, so given that, given the silence in all of this, what was the contract? I mean, how are we supposed to read into the terms and accept either your version or their version? The contract was a short-form agreement. The parties were obligated that if needed, a long-form agreement would be agreed to by the parties. Another question I have. What is if needed? What is if needed means? Who decides if it's needed? Question of fact. Objectively, was a long-form agreement needed here? Certainly, the plaintiff demanded one when it turned out that the plaintiff and the defendants had different views of the scope of the contract. Clearly, the record, despite defendants' objections to the contrary, contains evidence that on April 19, 2000, Dr. LaHaye wrote a letter saying, please, and I'm quoting from it, enter into, we hope you will comply with the spirit and letter of the agreement by immediately entering into good faith negotiations for a long-form agreement. We have, but you see, the difficulty is that you're using a long-term agreement as a proxy for different agreement. And that's the rub, because of the things that are mentioned in his letter that he would like to negotiate or renegotiate, each one of them is covered in the agreement, just not in the way that LaHaye deferred. I hate to do this, and I'm going to flatly disagree with you, and I'm sorry. They're not. That's what we're here for. They're not, Your Honor. We've already discussed the fact that there's no budget term in the contract. We've already discussed the fact that there are no distribution terms. I don't understand that, because the agreement contemplated a budget figure that was at least as low as $10 million, because that would have triggered a bonus payment. No, Your Honor. Unfortunately, that's not what the agreement contemplated. That dealt with author compensation. There's a floor. The author gets compensated as little as X. And there's a ceiling saying the author gets compensated as much as Y. But the fact that the author's compensation tops out at a certain number doesn't tell you anything about the budget. It just says if we hire Tom Cruise for this movie and it adds an additional $20 million to the budget, your compensation doesn't go up. You can't imply a budget figure from an author compensation figure. Flatly, the agreement was silent with respect to budget. They should have sat down and negotiated in good faith and come up with a number. Now, look, if they hadn't and they had negotiated in good faith, at least we would know where the parties were. If your position before the trial court was correct, the trial court would have bought into the proposition that you relied upon a $40 million figure that was discussed pre-game. No, Your Honor. The trial court found that we didn't rely upon a budget figure in entering into the contract. The question of whether we negotiated one at some point after January of 1997 is a completely different issue. And again, once you have a contract, as everyone would have to concede that this one is, with holes in it and an obligation to negotiate in good faith if another contract is needed, they had to sit down and negotiate in good faith. Whether or not they did is a question of fact for a trier of fact to resolve. There are many cases in California and before the circuit, the Baskin-Robbins-Copeland case. If you have an obligation to negotiate, you've got to do it in good faith. They never sat down and negotiated with us. Maybe we would have never reached an agreement, but that's speculative. That really is for a trial court to decide. At this point, Dr. LaHaye is stuck with an agreement that he has to, excuse me, Dr. LaHaye is stuck with an agreement that he has to litigate over every time he has a question. He asked for a long-form agreement. He never got one. He asked for a declaration from the district court, and he never got that either. The fact is, the defendants take every opportunity to say the contract means what they say it means. Where is the distribution strategy in here? How is the film supposed to be distributed? What's the budget? What, for example, are the accounting terms? How is Dr. LaHaye to be paid? None of that is in this agreement. And quite frankly, maybe the parties never would have reached an agreement on a long-form, but they should have tried, and their failure to try damaged Dr. LaHaye. Dr. LaHaye was entitled to a declaration, and those issues were raised below. Simply put, this is a case that's replete with factual issues. The implied covenant deals with factual issues. The breach of contract deals with factual issues. Dr. LaHaye was entitled to a trial. Thank you. All right. Thank you, Mr. Rudd. Mr. O'Connor. Thank you, Your Honors. I'm Michael O'Connor on behalf of the defendant in the Pele-Claude 10 pictures, and also with the security boarders of my office. Let me just first start with this issue of a trial on the merits. This is a case in which there was a trial on the merits. It's not a complicated case. It is not an unusual case. It's a case like, Your Honors have probably seen a number of times, where a plaintiff says, the sun and the moon were promised to me, it was not contract. They assert contract theories, they assert fraud theories. The court granted summary judgment on cross motions for summary judgment on the contract, and we had a trial on the merits on the same representations, the same testimony, five days of Dr. LaHaye saying what he was told about the contract. The one thing that's most obvious, which that isn't necessarily accurate, is the timing issue. Because the contract is basically silent on which of those four or five means of distribution was to come first. Let me address the implied covenant issue, which Your Honor raises. First of all, the hunting truffle question that you raised, this issue was not briefed, was not argued, was not discussed with the trial court in terms of a breach of the implied covenant for doing a video first versus a theatrical. That was simply not an issue that the court had an opportunity to address below. Addressing that issue, this is a contract in which Cloud Ten and Namesake had no obligations to do anything. They contracted in paragraph 16 of their agreement that the owner, Dr. LaHaye, is acknowledging that Cloud Ten is not promising to exercise an option, not promising to produce a picture, and not promising to distribute a motion picture. They paid an option fee, ultimately an option exercise, for the right to buy all of the motion picture video television rights. The court has made a finding that that's exactly what they got. They didn't undertake to do anything for Dr. LaHaye. They didn't undertake to do a distribution or have him question their distribution strategy. They simply bought the rights, and then they had the rights to be able to exercise them. This is not a case like the Marsu case or like the Locke case in which the defendant is undertaking to do something for the plaintiff. We're not undertaking to review film scripts like the Locke case. We're not undertaking to do a distribution of merchandising like in the Marsu case. We did not undertake to do anything. In fact, we stipulated that we weren't agreeing to do anything. In fact, we say we don't have to make a picture. We don't have to distribute it. And there is nothing in the agreement which limits Cloud Ten's right or Namesake's right to be able to distribute the picture in any way they want. And that's a reasonable position to have given the fact that profit participants can't be going around second-guessing the way studios are distributing motion pictures. If every time a profit participant was able to stand up here and say, well, wait a minute, I disagreed with the way Warner Brothers or Sony distributed a particular motion picture, we would have nothing but litigation over various profit participants' different views as to how that should be done. And even if the court were to consider an implied covenant existing in this case, how would that implied covenant be proven? It seems to me if there was a breach of that implied covenant, you would have to argue that there has to be subjective bad faith in the Locke case. Because whether a distribution by video or theatrical and how the distribution goes is certainly a matter of creative, artistic decision as opposed to a hard and fast rule. And how is this court to adjudicate that in light of the record before the court? There's nothing in the record in the court as to Cloud Ten's belief or disbelief in their distribution strategy. In fact, Cloud Ten believed their strategy. Dr. Lahaye at one point claimed he disagreed with it. But the findings of the court was is that he was notified of the video first strategy, that he expressed disappointment, but he thereafter cast his distribution check. He thereafter negotiated to review treatments and scripts. So these findings that the court has made and particularly the finding, which I think is relevant to the issue of was there an implied duty, was the fact that the medium in which this was going to be distributed was something that was not relied upon by Dr. Lahaye in deciding to enter into this contract. And I'm talking specifically about finding number 23, in which it states, in deciding to grant the rights to namesakes, the authors did not rely upon the discussions of budgetary figures, the authors continued participation in the movie production, nor upon discussions of the style, scope, or medium of the contemplated FLI movie. Now that is a binding finding on the plaintiffs. They do not appeal those findings. They're undisturbed. If you go through those findings, I think they give you a roadmap to a lot of the deficiencies in this case. May I ask you a findings question, which is different from anything we've talked about so far? And that is, in connection with the declaratory relief, the district judge doesn't seem to me to make any findings on the children series. In other words, he doesn't say whether it's a prequel or a sequel or any other kind of quill. What are we supposed to do about that? Well, first of all, that's not an issue that really is the subject of any of their briefing on this appeal. The court did not make a finding on the kids' rights issues. That was something that was simply not addressed in the findings. That's not an issue that deals with the thrust of their declaratory relief action, however, which was, if these terms in the agreement are somehow not contained in the agreement about budgetary figures and distribution, then the agreement is void and of no effect. I think the court, by upholding the terms in the agreement, that would govern their relationship. Correct. I have other agreements not yet reduced to writing concerning silence. I'm sorry, concerning the issues as to which the agreement was silent. Correct. Certainly the agreement contemplated the possibility of the parties entering into a long-form agreement, at which point the parties would negotiate not the terms that they had agreed upon, but upon industry standard terms like accounting issues and those things. But you talk about, this is an option contract, right? Right. Once the option was exercised, wouldn't there be a necessity to issue a long-term, a long-form agreement in order to establish some of the basic rights, such as assignment of copyright to, or other sorts of standard form agreements would have to be entered into if you were to exercise your option? Certainly that's the case. I mean, I don't think that it is always the case. But what if your client refused to do that? Not at all, Your Honor. The agreement contemplates in paragraph 18 that there may be situations where the parties need to enter into further agreements, and they mention a short-form option and assignment of rights and copyright and that kind of thing. And then in the same paragraph, the very next sentence, the parties say, if needed, the parties will enter into a formal long-form agreement embodying the terms that have been negotiated. Now, certainly it is possible that it would have had a necessity for doing a long-form agreement. It wasn't essential. And there are movies made that don't have long terms. You don't have all the terms to the exercise of the option in the memorandum agreement. I think we have the essential terms of there for the exercise of the option. Certainly there were additional terms that could have been negotiated. But what Dr. LaHaye sought to do in this case was not to negotiate other terms, customary, standard, industry standard terms. What he sought to do was renegotiate the terms that the parties had discussed. And they refer to this April 11th letter, which is in the record, which is their evidence of our failure to negotiate in good faith. And those terms, and that's at page 539 of the record, those are all terms that the parties had dealt with, had addressed in this agreement. And they weren't dealt with in the way that Dr. LaHaye wanted to deal with them, but they were addressed. And so the idea that we can be in breach of contract for failing to renegotiate terms that the Court, when they conducted a trial on the merits, found were never contemplated terms of the contract, seems to me to be an attempt to relitigate those issues that the Court has already decided. I thought I saw the word will negotiate in there. Well, actually, Your Honor, to me it would be more than may. It says, if needed, the parties will enter into a long-form agreement embodying these terms. I think the will says enter into a long-form agreement embodying the terms of the contract. It says will, and it also mentions standards of the industry. Correct. The next sentence is the only sentence that talks about negotiation, and that is the standard terms of an option agreement. You don't think you were obligated to enter into a long-term agreement which would incorporate terms and conditions standard in the industry? As to the standard terms and conditions, certainly if there had been a presentation to us by the plaintiff that he wanted to negotiate those other terms and standard terms and conditions, we would have had an obligation to negotiate them. Well, the expert said that there were additional terms that were standard in the contract that were included in there. Is that right? No. There are other standard terms that weren't included, but there was never a request to negotiate those terms. If you look at the record at 539, which is their letter of April 11th, that's the letter that they rely on to say that you failed to negotiate in response to this letter. But it also says these issues include without limitation, and it says those issues, and it doesn't say exactly. It doesn't say, you know, other products, children's books, and the agreement says that you would discuss these things in good faith. Correct. Assuming for the purposes of this appeal, although there were, in fact, negotiations, but assuming for the purpose of the appeal that we did not negotiate in response to that letter, I don't think that letter contains anywhere a request to negotiate other terms and conditions that are standard in the industry. It is a request to negotiate the terms that the parties already dealt with in their short-form agreement. And as such, it's an attempt to renegotiate the terms that the parties already discussed and agreed to. Well, they mention things in this letter about the release date of the movie and something about the publishing. This is on page 2 of the letter. The release date of the motion picture, one of the points that they argued was that there should have been a release of the motion picture by January 1st, 2000. That's an issue that they've dropped for the purposes of this appeal, but they did argue it below. But it's relevant to the argument you're making now that all this letter was was an effort to renegotiate the option agreement. But it doesn't seem to be, because all this was was an option agreement. Once you made the movie, you would need the movie agreement, or once you decided to make the movie. I mean, that's con – I used to practice entertainment law. I know how it works. Right. Okay? So you – it's not the full agreement between the parties. And therefore, don't you think Judge Hatter erred by saying that it was an integrated contract? I think as to the terms that it covers, it is an integrated contract. It expressly states there are no – As far as it goes. As far as it goes, the terms that it gives – There are other things. That's one case, the Sikor case. Correct. As far as it goes. But there's still other things that probably require a trial. No, there are other points that the parties – now, we're dealing now with was there a breach of contract for failure to negotiate? There was never a failure to negotiate standard industry terms and conditions because that was never presented. What was presented, which is at page 539 of the record, was an attempt to renegotiate the points that were dealt with. And the agreement talks about a long-form agreement will embody these terms, in other words, the terms we agreed upon, and in addition, other terms, not these terms, but other terms will be the subject of good faith negotiation. Well, we didn't get to those other standard industry terms. We were asked to renegotiate terms that the parties had already signed. Don't – I don't know what the custom is in the industry on this right now, but isn't it a standard term – isn't one standard term that you would negotiate would be whether a video would be released before a theatrical motion picture? It could be. I don't believe it's an industry standard term. And certainly, the agreement in our case gave Cloud 10 and Namesake the absolute unfettered right to decide which way they wanted to distribute it if they wanted to make a movie at all. So there's nothing in the agreement that limits it, and there's nothing to say that the parties – I think it would contradict the blanket and unequivocal grant of rights in the agreement to reduce those rights by saying, but you can only do it a certain way. Well, I – it could – you could look at it as contradicting, or you could look at it as supplementing or explaining. Well, to the extent that the agreement is susceptible of the limitation, then you might be right that there would be an explaining. But it's not, because the agreement is very clear that Namesake and Cloud 10 have the absolute discretion on how to make the picture, how to create the elements for the picture, and how to distribute the picture. There's no limitations whatsoever imposed, and there's no obligation to even do a distribution of a picture. So the question is, do we have to do a video first or theatrical first? We could elect to do neither or either. And so the question then is, is – does a request to negotiate limitations on a contractual right which is absolute and clear in the contract, is that changing a material term of the contract? I think it would – I think it is. I think it would be a material change and a diminution of Cloud 10 and Namesake's rights. So I don't think that under the law we would have an obligation to renegotiate this as part of a standard long-form agreement. That dealt with other terms. That didn't deal with the terms that the parties had already discussed, had already negotiated, and already agreed to. And in fact, I think the Court's findings are instructive that that was not an issue upon which the parties relied to enter into a contract. So consider this. If this case was remanded for a contract, a determination of whether this was a part of the contract or not, the Court's already made a finding that the medium in which this contract – the movie was going to be released was not something that Dr. LaHaye relied upon in entering into this contract. If these discussions were not concrete, if they were not promises, and if they were not relied upon by Dr. LaHaye in entering into the contract for the purposes of a fraud case, how can those same promises and representations be a contract? It seems to me to be absolutely inconsistent. What was your client's understanding of the term, if needed? I think if needed is read in the context of Paragraph 18, which immediately follows the sentence that said, if needed, we'll do a short-form assignment for copyright purposes. Was that if there was a situation where the parties needed to have a long-form agreement, such as for getting third-party financing or to getting a bond or some other third-party reason, that the parties would create a long-form document that embodied these terms and then they would negotiate the standard other terms. I don't think that situation presented itself. There certainly was no request here to negotiate those other industry standard terms. I don't think if needed means that if the parties disagree about what they've agreed to, that we then have a negotiation over those same terms again to decide whether or not one party's interpretation or the other party's interpretation is going to be upheld. That's what courts are for. And if the parties don't have an agreement, they don't have an agreement. The judge here, considering the evidence, found that there was an agreement and found that the representations that they claimed were inconsistent with the agreement upon which they relied were in fact not representations. They weren't concrete, they weren't promises, and they weren't relied upon. So the idea that there hasn't been an opportunity for those issues to be fully heard and considered by the trial court, I think, is completely an inaccurate statement of the record. I think in this case, we have those representations discussed at great length. We have the testimony of that heard by the trial court, and the trial court makes findings. Those findings are not being appealed here. Kennedy, but where does the declaratory judgment issue enter in here, if at all? The declaratory judgment is, given the context of what the court decided, I think a complete superfluous and unnecessary decision here. Because the issue on declaratory relief in the trial court was making determination that if these terms of the agreement are not contained in the writing, that there is not a meeting of the minds in its void. That was essentially a rescission claim in the declaratory relief. The court found that, on the contrary, the contract was an integrated contract, that there were no other representations that rose to the level of promises, and the party's plaintiff did not rely on those representations in any event. So therefore, the contract is enforceable. So the court's declaration and the findings really, I think, make a declaration of further discussion of those points unnecessary. All right. Unless Your Honors have any other questions. I think not. Thank you very much. Thank you, Mr. O'Connor. Mr. Rudd. Thank you, Your Honors. I think I deserve a dismission of time here. With respect to Mr. O'Connor's observations about the district court's findings and discussions of reliance, reliance is simply not an element of breach of contract. If the court reads the district court's findings, they have nothing to do with the elements of a breach of contract claim, which was not tried. Well, the findings have to do with the promissory estoppel. The findings have to do with promissory estoppel and why we chose namesake over its competitor, Noran, in January 25th and 26th, before four months later entering into the contract. They don't have to do with what terms ultimately came into being and ended up in the contract, because they couldn't. Those issues were not before the court. You're not appealing the promissory estoppel issues. We are not. Well, is there any evidence of pertinent negotiations in that interim? They did negotiate. In fact, drafts went back and forth. And I believe – I don't know if it was in the – It's not my question. Is there any evidence that would cause the decision to be different on whether there were promises made on the subject? Quite candidly, Your Honor, I do not know whether such evidence was adduced to the district court stage. I would be happy to provide a brief on that issue. Well, I infer that the answer is no. There wasn't. I know that whatever the judge found with respect to the negotiations that occurred before making the decision were not any different from the ones that occurred before the agreement was entered into. Again, I don't wish to dispute that, but I don't know for a fact that to be the case. And I suggest that since the contract ended up being silent on points such as budget distribution, accounting, script. My question is, is there anything that was talked about between the two times? You keep saying the same thing. And the short answer is, and I apologize. And the two things aren't binding because they had to do with the decision you made to choose one rather than the other, you know, filmmaker. And quite candidly, I don't know. I don't believe that we – Because I think there are none. I don't believe we put out any evidence at trial on that issue because it was passed. With respect to the video first strategy, we did deal with it in the opposition for motion for summary judgment. It is on pages 14, 15, and 23. And with respect to our demand for a long-form agreement, I'd like to just look at the letter rather than accept Mr. O'Connor's characterization of it. The authors – or, excuse me, Dr. LaHaye sent a letter describing the necessity of entering into a long-form agreement. He listed a series of things he wanted in the agreement. That was my bid. Here's what I want. The scope of motion picture rights. He says, gee, the agreement's silent on it. Budget. There's no budget figure. Author's role in producing a movie. It's silent. He goes on. He says, these are the things I want, among other things. He finally says, we hope you will comply with the spirit and letter of the agreement by immediately entering into good-faith negotiations for a long-form agreement that resolve these and other issues. He could not more clearly have asked – The proposition presented by the defendant that your client, you believe your client did ask to negotiate issues which were standard in the industry? Yes, Your Honor. This agreement says, we want these and other issues. Let's sit down and negotiate. Are you relying on other issues? Or tell me specifically what it says about that. I believe I'm relying on both. I believe we said these are specific issues we want addressed and other issues would have been standard issues. Evidence of damage from any of those other conditions. The evidence of damages with respect to failure to negotiate, I believe, are dealt with in the Copeland v. Baskin-Robbins. Yes, we've had four videos that have come out that have gone direct to video. Judge Reed just asked you whether you actually ask for negotiations on standard industry terms and conditions. And the short answer is we didn't ask for it in those precise terms. We said, let's negotiate a long-form agreement including these and other issues, and they said no. Mr. O'Connor characterizes that as us demanding to take back what had already been granted in the contract. But really, isn't that an issue of fact? We'll never know sitting here whether the parties would have reached agreement on that issue. We never got that far. And the fact is, we are now five years down the road. Dr. O'Haye is suing for an accountant. What did that letter say? The letter said exactly. Did you just focus in on what issues your client wanted to negotiate? We said the issues that require clarification include without limitation scope of motion picture rights, budget, author's role in producing the movie, distribution of the motion picture, other products, and children's books. We hope you will comply with the spirit and letter of agreement by immediately entering into good faith negotiations that resolve these and other issues. We will never know how far we would have gotten with the negotiations because simply put, we never got there. And now we're down below suing for an accounting because there's no accounting provision in here. They had to sit down and negotiate. They never did. And we have been damaged. And we're entitled to a trial on that claim. Thank you, Your Honor. Okay. Thank you, counsel. Now, I have a question for both of you. And that is, have you all given any thought to mediating this dispute? Let me respond on behalf of Dr. O'Haye. Since the first movie was made, Mr. Lalonde, the producer of the movie, has decamped to the tax haven of Barbados with the $70 million he made on the four videos. Well, we're not trying to argue merits. My question is relatively my question. Look, hold on. I'm not asking about any merits of any discussions you've had. My question is really simple, and that is, have you given any consideration to mediation because the circuit does have a rather effective mediation office, either through our office or through CLS or something similar? We've tried mediation in the past, and we certainly tried unstructured settlement negotiations in the context of more recent events. You just have no interest in pursuing? I don't believe it would be helpful, Your Honor. Your Honor, we did try mediation, and we certainly are willing to consider a mediation. Given the fact that they've recently filed yet another lawsuit against my client, it seems like the parties seem to be a bit polarized. But that's something that we're always open to. You could settle both cases. The other one is a little bit more complicated. It's all about money, isn't it? OK, I think probably the question's been answered. Thank you, counsel. The matter just argued will be submitted.
judges: Rymer, Wardlaw, Reed